IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EAGLE INDUSTRIES UNLIMITED, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:11 CV 1603 RWS |
| ) | |
| KDH DEFENSE SYSTEMS, INC., ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF EAGLE INDUSTRIES UNLIMITED, INC.'S
TRIAL BRIEF**

This case centers on the exclusive Teaming Agreement that Plaintiff Eagle Industries Unlimited, Inc. ("Eagle") entered into with KDH Defense Systems, Inc. ("KDH") in mid-2009 for a Marine Corps procurement. That procurement was for a five-year, indefinite delivery indefinite quantity contract ("IDIQ Contract") under which the Marines would issue delivery orders potentially totaling hundreds of millions of dollars in Improved Modular Tactical Vests ("IMTVs") and Plate Carriers ("PCs")—two types of body armor vests worn by Marine Corps soldiers in the field.

By virtue of their exclusive Teaming Agreement, both Eagle and KDH gave up the right to compete as a part of other teams to win this work. The Teaming Agreement has an express term which made it exclusive – KDH was required to subcontract with Eagle for the agreed upon components of IMTVs that Eagle had agreed to produce. Moroever, the Teaming Agreement required that KDH and Eagle negotiate prices in good faith and, in the event of a dispute over pricing or any other terms, continue to honor the Agreement (including the exclusivity provision) while the parties resolved their dispute.

The Eagle/KDH bid was successful and the team was selected by the Marines as one of two successful teams eligible to receive awards of orders for IMTVs and PCs.  The team received initial, substantial awards for manufacture of IMTVs and PCs under what are referred to in the case as Delivery Orders 1 and 2 or "DO1" and "DO2".

After successfully winning the IDIQ Contract and the intial round of delivery orders, however, KDH abandoned the teaming concept in August 2011, when the Marines issued a notice of a possible new award for delivery of IMTVs.  This new opportunity for work under the IDIQ contract became known as Delivery Order 3 or "DO3".  In anticipation of that work, KDH secretly began negotiating with, and ultimately awarded work under DO3 to KDH's long time supplier on other programs, Savannah Luggage.

Unbeknownst to Eagle, KDH sought and obtained price quotes from Savannah Luggage for the production of DO3 IMTV requirements—that were Eagle's to perform under the Teaming Agreement—and based on those quotes, KDH developed internal cost estimates for producing the vest.  KDH approached Eagle and demanded that Eagle reduce its recently agreed upon IMTV prices dramatically.  In fact, KDH demanded that Eagle agree to prices that were below KDH's own estimates for the cost of producing the IMTVs.  It demanded those prices, under the threat that it would "go in a different direction" if Eagle did not cede to its demand–i.e. award the work to Savannah Luggage.  And that is exactly what KDH did.  KDH ignored Eagle's attempts to negotiate prices in good faith and refused to honor the Teamming Agreement with Eagle.  KDH's actions breached, among other terms, the express exclusivity terms of the Teaming Agreement with Eagle, and also breached KDH's implied duty of good faith and fair dealing that Missouri law recognizes as a part of every contract.

KDH also breached its obligation to pay Eagle's costs of shipping its products to KDH. Over the course of February through early August 2011, the parties negotiated revised pricing for DO1 based on changes the Marines had made to the IMTV designs.  In each of Eagle's many pricing submissions made to KDH, Eagle expressly conditioned its proposed pricing on the assumption of "FOB Origin" which, in this context, meant that Eagle's prices were premised on the fundamental assumption that KDH would pay shipping as part of the negotiated price.  KDH accepted Eagle's proposed prices for IMTV's without any objection, which prices had as an integral component that KDH – and not Eagle – would cover shipping costs.  Then, KDH acted on the pricing submitted by Eagle, incorporating Eagle's prices into KDH's revised pricing proposals to the Marines and eventually incorporating those Eagle prices into the Contract Modification with the Marines that set new prices between the Marines and KDH.  KDH's lack of any objection to the expressly stated condition of FOB Origin and KDH's manifest acceptance of Eagle's prices by its incorporation of those prices into the contract, evidence the binding and enforceable nature of the parties' agreement on that shipping term.

Finally, KDH has included a counter claim in its case alleging that Eagle quality and schedule problems caused KDH injury and additional costs.  The facts do not support either (i) KDH's assertions of injury due to any quality or schedule issues attributable to Eagle or (ii) KDH's asserted damages which bear no reliable association with any such quality or schedule issues.  To the extent KDH incurred excess costs, they are attributable to KDH's own unilateral actions and not Eagle.

I.      ISSUES FOR TRIAL

Eagle identifies the key issues for resolution at the upcoming trial as the following:

   A.    Did KDH breach the parties' exclusive Teaming Agreement when it issued purchase orders for the DO3 IMTV requirements to Savannah Luggage rather than Eagle?

B.  Did KDH breach the implied duty of good faith and fair dealing by its actions relating to DO3 when it demanded unreasonable, below cost prices from Eagle and awarded the DO3 IMTV vest requirements to Savannah Luggage?

C.  Did KDH and Eagle reach a firm, enforceable agreement on the term of "FOB Shipping" as an integral component of Eagle's negotiated prices for DO1 production, such that KDH was responsible for Eagle's shipping costs?

D.  Is there sufficient factual support for KDH's allegations that Eagle's production of IMTVs under DO1 experienced quality assurance and schedule failures rising to the level of a material breach by Eagle?

## II.  EAGLE'S AFFIRMATIVE CLAIMS AND DEFENSES TO KDH'S COUNTERCLAIM

Eagle essentially has two, alternative claims asserting KDH's breach of the parties' exclusive Teaming Agreement and a third affirmative claim for recovery of its shipping costs on DO1 production. To the extent KDH decides to pursue its counterclaim at trial, Eagle will present its defenses to KDH allegations that Eagle's products were noncompliant with applicable quality assurance or schedule requirements.

A damages issue related to Eagle breach claims is presently before the Court on KDH's Motion for Partial Summary Judgment on Eagle's claim for lost profits. (Doc # 68.) Eagle contends that the relevant law from Missouri, whether based on UCC or not, supports the measure of recovery for breach in this instance as "gross profits" which by law includes elements of fixed, unabsorbed overhead and net profit. (*See* Doc #'s 72 and 75.) KDH contends that Eagle is foreclosed by the bar on consequential damages in the parties' Teaming Agreement from seeking the unabsorbed overhead element of Eagle's gross profits. Eagle will be filing a surreply to KDH's Motion for Partial SummaryJudgment on or before March 29, 2013.

A.  KDH Breached the Teaming Agreement's Term Making Eagle the Exclusive Supplier of IMTVs to KDH when KDH Awarded the DO3 Work to Savannah Luggage

From the outset of the parties' teaming arrangement for the IDIQ Contract, both KDH and Eagle knew that future delivery orders would be awarded by the Marines using something

4

called the "Fair Opportunity clause" in the Contract. That clause was stated in the original contract back in 2009 and provides that future orders (those after DO1 and DO2, which were awarded simultaneously with the award of the IDIQ contact) would be awarded based on competition between and among the companies that were selected in the original award, including KDH. Awards would be "based on a number of factors including ability to meet delivery schedule, past performance on previous orders and price." Pltf-2 at MC0000310. The parties understood, therefore, that price was a significant factor for the award of future orders.

When representatives of KDH and Eagle met with the Marines' Contracting Officer in Quantico, VA on July 29, 2011, the Contracting Officer announced that the Marines would be issuing an order for additional IMTVs within the next month and it would largely be a price competition because the factors of schedule and past performance were not yet applicable. Following the meeting, KDH and Eagle representatives had a brief discussion on their way out to their respective cars. Mr. Herbener, KDH's owner and president, is reported as saying that both KDH and Eagle would have to "sharpen their pencils" on pricing—but neither then, nor up through the parties' exchanges once the DO3 requirements were issued by the Marines, did he specifically explain any basis for his position or provide Eagle with reasonable guidance on what adjustments to pricing were necessary—other than summarily demanding dramatically reduced prices.

On August 24, 2011, the Marines issued the Fair Opportunity Notice letter, which officially announced the upcoming competitive delivery order and provided a response date for bids of August 29, 2011. In response to receiving the Fair Opportunity Notice letter, KDH did not collaborate with Eagle to formulate their bid, as one would expect from a teaming partner. Particularly the prime contractor in a teaming relationship. Rather, KDH provided Eagle with a

5

one line email, late in the day on the Friday preceding the Monday deadline for KDH's submission of its bid, setting forth the price that "Eagle needs to be at." KDH's required price was almost 25% less than the prices that Eagle had just spent six months negotiating with KDH for the DO1 production. The prices put forth by KDH were not only lower than the prices that KDH and Eagle had just agreed to for the amended Teaming Agreement schedule, KDH's prices were less than KDH's own internal estimate of what it would cost to produce the DO3 IMTVs and would have required Eagle to lose money on every vest sold. Eagle was justifiably skeptical of KDH's demand for slashing Eagle's price and requested KDH to provide an explanation. Beyond general assertions of knowledge regarding the competitor's pricing, KDH provided no justification. Instead, it worked over the weekend to solidify its pricing using a price quote it had obtained from one of Eagle's competitors, Savannah Luggage.

On the Monday morning when KDH's bid was due, it issued Eagle a "Best and Final Offer" price, which in this context meant that KDH was no longer offering to negotiate and was drawing a line in the sand with a take it or leave it price. Yet, KDH's increased "BAFO" price, provided to Eagle less than two hours before the deadline for submission of the bid, was still substantially below KDH's own internal cost estimate of what it would take to produce the IMTVs. When Eagle did not accept KDH's demand that they accept the BAFO prices—which would have resulted in Eagle losing money—Mr. Herbener informed Eagle that KDH was "going in a different direction." That different direction was awarding the work to his longtime supplier Savannah Luggage, from whom he had secretly requested a price quote weeks before the Marines had ever issued their Fair Opportunity Notice.

Finally, when Eagle sought to engage with KDH and explore a reasonable, negotiated resolution to KDH's unreasonable pricing demands, KDH refused to negotiate. Their ultimatum

6

was that they would award the work to Eagle's competitor, Savannah Luggage, unless Eagle capitulated.  This was done in the face of Eagle offering prices for the DO3 IMTV requirements that were nominally more than KDH's own internal cost estimates for production and, in one instance, almost identical to/less than the price being offered by Savannah Luggage.  KDH refused to budge and chose instead to breach the Teaming Agreement by awarding the DO3 requirements to Savannah Luggage.  The award to Savannah Luggage included the award of the majority of requirements in August 2012—almost over a year after the parties' dispute arose over DO3.  There was plenty of time for KDH to be reasonable and negotiate a fair price with Eagle—but KDH refused and breached the parties' agreement instead.

KDH breached the exclusivity terms of the agreement by awarding work reserved exclusively for Eagle to Savannah Luggage and itself.  KDH awarded the labor portion of DO3 work to Savannah Luggage and retained for itself the materials portion of the DO3 work.  Eagle had the exclusive right to perform both components of this work pursuant to the straightforward language of the Agreement which made Eagle the <u>exclusive</u> subcontractor to KDH for production of the IMTV vests.  Pltf.-1 (Clause 1.3).  KDH's actions deprived Eagle of the opportunity to earn its gross profit on the work that KDH was required to award to Eagle, but blantantly diverted to Savannah Luggage. Eagle is entitled to its damages.  As noted above, the measure of Eagle's lost profits is an issue currently before the Court on KDH's Motion for Partial Summary Judgment (Doc. # 68).

      B.    KDH Breached the Implied Duty of Good Faith and Fair Dealing by its Actions Relating to DO3

Eagle's claim that KDH breached the Teaming Agreement's implied term of good faith and fair dealing is premised on KDH's conduct in "negotiating" the pricing for DO3 with Eagle, and ultimate decision not to award the DO3 requirements to Eagle.  The implied duty of good

7

faith and fair dealing is present in every contract under Missouri law.  *See Envtl. Prot., Inspection, and Consulting, Inc. v. City of Kansas City*, 37 S.W.3d 360, 366 (Mo. Ct. App. W.D. 2000).  The duty requires that performance and enforcement terms be carried out in good faith and that one party not prevent or hinder the performance of the other party.  *See id.*  Here, Eagle alleges that KDH did not act in good faith by its actions of: (1) secretly obtaining price quotes from Eagle's competitor, Savannah Luggage; (2) demanding that Eagle agree to pricing that would have required Eagle to provide the IMTV vests at a loss, was substantially lower than the prices the parties had just negotiated, and was below KDH's own estimates for the cost of the work; and (3) ultimately awarding the DO3 labor work to Savannah Luggage.

Moreover, KDH disregarded its obligations under the Teaming Agreement terms pursuant to the Disputes Clause, which required KDH to permit Eagle's continued performance of the Teaming Agreement while the parties resolved the issues occasioned by KDH's pricing tactics.  Pltf.-1 (Clause 12.0).  Eagle is separately entitled to its damages for KDH's breach of the duty of good faith and fair dealing under these circumstances.  The measure of damages is the same for breach of the implied duty of good faith and fair dealing as it is for breach of the express terms of the Teaming Agreement: Eagle's gross lost profits on the work that it should have been awarded but was not.

   C. KDH and Eagle Reached an Enforceable Agreement on Eagle's Prices, Which Were Based on FOB Origin for DO1 Production, Obligating KDH to Pay the Shipping

From February through August 2011, Eagle submitted numerous updated proposals to KDH for new prices resulting from the Marine's re-design of the IMTV after initial award of the contract in 2009.  Each of Eagle's proposals stated, in clear, straightforward terms, the assumption of FOB Origin as a basis for its pricing.  In this context, FOB Origin meant KDH was responsible for paying Eagle's shipping costs.

KDH's Mr. Herbener contends that he never "noticed" the stated assumption of FOB Origin until after August 31, 2011 and the dispute had arisen regarding DO3 pricing and the award of that latter work.  That contention is not credible.  KDH incorporated Eagle's prices into its own prime contract price proposals to the Marines as early as May 2011 and then entered into a binding modification with  the Marines on the revised prime contract prices—which necessarily were based, in part, on Eagle's proposed pricing that Eagle had provided up to that point.  KDH's acceptance of Eagle's prices, which were expressly conditioned on FOB Origin shipping, was manifested by its incorporation of those prices into its proposals to and eventual agreement with the Marines.  Thus, KDH's acceptance of FOB origin is shown not only by its tacit acceptance of that term over six months of pricing proposals from Eagle, but also by its affirmative actions to incorporate Eagle's prices into the eventual prime contract.

This Eagle claim presents the legal issue of contract formation and whether KDH's actions operated as acceptance of Eagle's pricing and that pricing's integral assumption of FOB Origin.  *See* Mo. Rev. Stat Section 400.2-204 and -206 (2012); *Luebbert v. Simmons*, 98 S.W.3d 72, 77-78 (Mo. Ct. App. W.D. 2003).  The issue also may present for the Court a question of conflict of laws because while the parties agree that Missouri law applies to matters arising under the Teaming Agreement, it is Eagle's understanding that KDH may contend that another state's law applies to the FOB Origin term because the question relates to the agreement of the parties as to a term of issued purchase orders from KDH, which incorporated other than Missouri law.

> D.      The Facts Do Not Support KDH's Counterclaim that Eagle Breached Quality Assurance and Schedule Requirements in its Production for DO1 and There Is No Basis for KDH's Counterclaim Damages

In early 2012, about three months after Eagle filed this present suit against KDH as a result of KDH's diversion of work under the exclusive Teaming Agreement to Savannah Luggage, KDH asserted a number of different quality concerns about products being delivered

9

by Eagle. Some quality issues and their resolution are a natural part of the start of up of production in the body armor industry, and Eagle's start up was no exception. There were a few quality issues that arose but no significant issues that resulted in KDH incurring any costs out of the ordinary or any form of damage. More importantly, a number of the key quality issues that KDH raised were not issues at all: certain piece parts conformed to specifications but when assembled were out of tolerance, a condition that KDH admittedly experienced as well; other issues were a function of reasonable disagreements over methods for measuring specification compliance. KDH also, on its own, decided to expend funds to place an employee at Eagle's facility and now seeks to shift the cost of its decisions to Eagle, without basis.

KDH's counterclaim and Eagle's defense to that counterclaim raise factual issues of whether KDH's asserted problems with the quality and timeliness of Eagle's IMTVs delivered under DO1, and KDH's asserted damages, are supported by the evidence. Eagle contends and will show at trial that the evidence does not support KDH's counterclaim either as to liability or damages.

III.  CONCLUSION

KDH deprived Eagle of the profits it would have earned had KDH simply complied with the terms of the bargain that it struck and from which it benefitted. KDH materially breached the exclusivity terms of the Teaming Agreement, by refusing to award work to Eagle, as required under the Teaming Agreement, and instead awarding that work to Savannah Luggage and itself. KDH's unsavory tactics in secretly obtaining price quotes from Savannah Luggage, demanding that Eagle agree to low-ball pricing without negotiating in good faith pursuant to the Dispute Clause of the Teaming Agreement, and ultimately awarding the DO3 labor work to Savannah Luggage and itself rather than Eagle constitutes a separate breach of the implied duty of good faith and fair dealing present in every contract under Missouri law. For each of these breaches,

Eagle is entitled to its damages measured by the gross profits that it would have earned had the work properly been awarded to Eagle.

Further, KDH must pay appropriate shipping costs to Eagle.  Eagle's prices were premised on the fundamental assumption that KDH would pay shipping as part of the negotiated price, which KDH accepted without objection but has refused to pay.  Finally, the evidence will show that KDH's counterclaim for breach of quality assurance and schedule requirements is meritless and should be dismissed.

Respectfully submitted this 26th day of March, 2013.

          */s/ Mark J. Meagher*
Mark J. Meagher (admitted pro hac vice)
mmeagher@mckennalong.com
David R. Fine (admitted pro hac vice)
dfine@mckennalong.com
MCKENNA LONG & ALDRIDGE LLP
1400 Wewatta Street, Suite 700
Denver, CO  80202

Giuseppe S. Giardina, E.D. #497763 MO
Giuseppe.Giardina@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO  63105

*Attorneys for Plaintiff Eagle Industries Unlimited, Inc.*

11

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 26th day of March, 2013, I caused the foregoing PLAINTIFF EAGLE INDUSTRIES UNLIMITED, INC.'S TRIAL BRIEF to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

David A. Dorey, Esq.  
Michael A. Iannucci, Esq.  
BLANK ROME, LLP  
1201 N. Market St., Suite 800  
Wilmington, DE 19801  
dorey@blankrome.com  
iannucci@blankrome.com  

John S. Farmer, Esq.  
Ross E. Rochat, Esq.  
THOMPSON COBURN LLP  
One US Bank Plaza  
St. Louis, MO  63101  
jfarmer@thompsoncoburn.com  
rrochat@thompsoncoburn.com  

                                            */s/ Carol Neubauer*